In re WINDHAM POWER
LIFTS, INC., Debtor.

WINDHAM POWER LIFTS,
INC., Plaintiff,

v.

DEPARTMENT OF DEFENSE, AIR FORCE DIRECTORATE OF CONTRACTING AND MANUFACTURE, Defendant.

Bankruptcy No. 87–02696–APG.
Adv. No. 87–0183–APG.

United States Bankruptcy Court,
M.D. Alabama.

Nov. 13, 1990.

C.H. Espy, Jr., Dothan, Ala., for plaintiff.

Calvin C. Pryor, Montgomery, Ala., for defendant.

## MEMORANDUM OPINION

A. POPE GORDON, Bankruptcy Judge.

Windham Power Lifts, Inc. filed this complaint against the Department of Defense[1] to recover $31,264.03 for storing and insuring property of the government for a period of eleven months following the debtor's petition in bankruptcy.

Trial was held October 24, 1990.[2] Many of the facts were undisputed. The remainder are found by the court pursuant to Bankruptcy Rule 7052.

The government awarded Quality Plus Equipment, Inc. a contract to manufacture 234 forklift trucks.[3] Quality subcontracted with the debtor to manufacture the forklifts.[4]

The debtor's subcontract with Quality incorporated the terms of the government contract[5] which, in turn, incorporated applicable provisions of the Federal Acquisition Regulations.

The debtor filed a petition under Chapter 11 in bankruptcy on October 22, 1987 after having manufactured and delivered 97 forklifts.[6]

On the petition date, the debtor had on hand completed forklifts, forklifts in process, and large quantities of parts and materials for use in forklift production.[7]

Both the debtor and the government claimed an interest in this property remain-

---

1. The debtor initially commenced this adversary proceeding by filing a complaint against Quality Plus, Inc. on December 28, 1987. The government was added as a party defendant in January, 1988. Quality then removed a case filed by the debtor in state court. The state court case was consolidated with the instant adversary proceeding.

   Quality asserted a counterclaim against the debtor by four counts in its answer. Quality and the debtor then settled their claims against each other, and Quality was dismissed as a party. The sole remaining dispute in this proceeding is the debtor's claim against the government for the costs of storing and insuring the government's property.

2. The debtor filed a motion for summary judgment on August 20, 1990. The motion is due to be denied.

3. This amount was later increased from 234 forklifts to 401 forklifts.

4. Quality had no manufacturing capabilities. The debtor was Quality's only subcontractor.

5. The subcontract provided the following:

   All terms and conditions of contract number F090603–85–C–0125 apply including but not limited to MIL–I–45208A.
   Delivery schedule to be negotiated at a later date.
   Progress payments available IAW FAR requirements.

6. Under the subcontract, Quality paid the debtor from the progress payments Quality received from the government. The debtor received a total of $4,662,195.98 in this manner.

7. The property was described as ranging from "nuts and bolts to sheets of steel" and, of course, the completed and partially completed forklifts. This property was stored throughout the plant, both within and without. According to the debtor, the property occupied a total space of 11,500 square feet. It is undisputed that the debtor purchased the property with a portion of the $4,662,195.98 received from Quality.

ing at the debtor's plant.[8]

The court entered an order one week after the bankruptcy petition requiring the debtor to segregate, insure, and hold the property subject to further order of the court.[9]

The government terminated its contract with Quality on April 19, 1988.[10] It appears, however, that the subcontract was in default even prior to the debtor's filing its petition in bankruptcy in October, 1987.

The court entered an order on April 28, 1988 holding that the government held title to the property free of any interest of the debtor.

During the next two and one-half months, the debtor withheld permission to the government to enter the plant to begin removing the property. The debtor spent part of that time in an unsuccessful attempt to renegotiate the Quality contract directly with the government.

The debtor finally allowed the government on July 12, 1988 to send experts to the plant to assess shipment needs.[11] The government then began planning for and organizing the removal of the property from the debtor's premises.

It took the government two months to plan the move. The government spent much of this time negotiating with the debtor by telephone and by mail regarding the dates of the move, the hours of work, the number and names of personnel to be involved in the move, and use of the plant facilities.

The government actually commenced the two-week job of packing and shipping the property on September 13, 1988. The job took thirteen men working seven and one-half hours per day.[12]

## DISCUSSION

Prior to termination of the contract, the debtor was obligated to store and insure the property for the government without charge.[13]

▪ Therefore, the court must decide whether the debtor may charge the government for storage and insurance costs incurred *after* termination of the contract and *before* actual removal of the property.

The court is unable to find any basis in law or equity to support the debtor's claim.[14]

The property remained in the debtor's possession largely through its own actions. Although it took the government two months (from July 13 to September 13,

---

**8.** The debtor claimed a security interest lien; the government claimed title free of any lien by the debtor.

**9.** The order dissolved a temporary restraining order entered against the debtor and stated in pertinent part as follows:

   B. The debtor, in conjunction with the authorized agent of the United States, is to identify and segregate those forklifts or other items of inventory claimed by the United States, and to hold such items subject to the further order of this court.

   C. The debtor is to maintain at all times adequate insurance to protect the United States against casualty loss of those forklifts or other items of inventory identified as above as property claimed by the United States.

**10.** Prior to termination of the contract, the debtor was obligated to store and insure the property for the government without charge. 48 C.F.R. § 45.612–2, incorporated in the contract, provides as follows:

   [T]he expense of storage, including any costs incident to the transportation to and from the storage area, shall normally be borne by the contractor and shall not be charged directly or indirectly to government contracts, unless the contracting officer determines that the storage is for the convenience of the government.

No such determination was made in this case.

**11.** The government estimated that removal of the property from the debtor's premises would require thirty trucks and 37,419 cubic feet of packaging. The government estimated the property weighed 1,135,020 pounds.

**12.** There was some evidence that the government wanted to work overtime to get the job done more quickly, but the debtor limited the daily hours.

**13.** *See* n. 10, *supra.*

**14.** The debtor has provided no statutory authority to support its claim. No contract existed between the *government* and the *debtor,* and none can be implied under the facts of this case. Further, the government was not guilty of any tortious conduct under the facts of this case.

1988) to plan the move, planning did begin without undue delay after the July 13, 1988 visit to the plant.

It is not surprising that planning and organizing the move took two months. Removal of such a large quantity of goods presented tremendous and unusual logistical problems.[15] In addition, the government spent much of the two-month period negotiating with the debtor regarding details of the move.[16] Under the circumstances, the court cannot say that the two-month delay was entirely the fault of the government or that the government acted in bad faith.[17]

The court concludes that equity is on the side of the government. The evidence does not show that the debtor was required to store the property against its will.[18] Additionally, it appears that it was in the best economic interest of the debtor for the government to take delivery of the property at the plant site rather than require the debtor to deliver the property to the government at another site.[19] If the debtor has an equitable claim for compensation, it would be against the contractor Quality.

The debtor argues, without merit, that the order entered at the outset of the case requiring the debtor to segregate, hold, and insure the property bestows validity to its claim. The order was entered prior to termination of the government contract. The *contract* required the debtor to store the property at the expense of the debtor.[20]

The order did not purport to change the contract; its purpose was merely to protect the government's interest in property claimed adversely by the debtor.

■ The debtor further argues that it has a warehouseman's lien for storage. However, under Alabama law, the debtor is not a warehouseman, because the debtor is not "a person engaged in the business of storing goods for hire." *See Ala.Code* § 7-7-102(1)(h) (1975).

■ Neither is the debtor a bailee, because the debtor is not a "person who by a warehouse receipt, bill of lading or other document of title acknowledges possession of goods and contracts to deliver them." *See Ala.Code* § 7-7-102(1)(a) (1975).

■ The facts do not support a common law bailment for compensation in that there is no evidence to show that the government and the debtor had an agreement, either express or implied, that some price or compensation would be paid in return for storing the property after termination of the contract. Absent such an agreement, no bailment for compensation arises. *See* 8 Am.Jur.2d, *Bailments* § 20.

Judgment for the government will enter separately.

## FINAL JUDGMENT

In accordance with the Memorandum Opinion entered this day, it is hereby

---

15. The testimony indicated that it was unusual for the government to undertake movement of such large quantities (about 1,100,000 pounds) of government property from a subcontractor's plant. Even preparation for the move was time consuming. Arrangements had to be made for obtaining packaging material, equipment, and trucks which would arrive at the site on a given date with the necessary personnel properly instructed. Further, the government had to determine and provide for the ultimate destination and storage of the goods and materials.

16. *See* text, *supra,* at page 183.

17. According to testimony, the government wanted to complete the move as quickly as possible by working overtime; however, the debtor limited the government workday to 7½ hours at the plant.

18. Testimony for the debtor indicated that the debtor needed to use the space occupied by the property for other purposes. Yet, curiously, the debtor did not attempt to minimize the storage space required. The forklifts, parts and materials were left scattered in all parts of the plant, *without regard to economy of space.* Also, the lack of cooperation in allowing prompt removal of the property after the debtor became aware of the court order vesting title in the government is not consistent with immediate need for the space.

19. *See* 48 C.F.R. § 52.232-16(j)(3)(e)(v) under which the government has the right to require delivery to the government of property to which the government has title under a subcontract if "the subcontractor becomes bankrupt or insolvent."

20. *See* n. 10, *supra.*

ORDERED that the plaintiff's motion for summary judgment is DENIED.

It is further ORDERED that judgment enter in favor of the defendant and that the plaintiff have and recover nothing from the defendant.